**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **IN RE DOCTOR ALLIANCE DATA BREACH LITIGATION** | Master File No. 3:25-cv-03076-E<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Barbara Catabia, Lisa Colucciello, Harold Weathers, Martha Hobbs, and Rachel Dias ("Plaintiffs"), individually and on behalf of all other similarly situated individuals (the "Class" or "Class Members," as defined below), by and through their undersigned counsel, file this Consolidated Class Action Complaint against Defendant My485, Inc. d/b/a Doctor Alliance ("Defendant"). Plaintiffs allege the following based on personal knowledge of facts, upon information and belief, and based on the investigation of their counsel as to all other matters.

## I. INTRODUCTION

1. With this action, Plaintiffs seek to hold Defendant responsible for the harms it caused Plaintiffs and similarly situated persons in the preventable data breach of Defendant's inadequately protected computer network.

2. On or around November 10, 2025, unidentified cybercriminals announced the attack against Defendant on a poplar data leak forum, which is often utilized to exchange stolen records ("Data Breach" or "Breach").[1] The stolen data includes sensitive personal information and medical data ranging from diagnoses to checkup summaries.

[1] Vilius Petkauskas, *Doctors Alliance breach allegedly exposes patients' health data* (Nov. 10, 2025), https://cybernews.com/security/doctor-alliance-breach-allegedly-exposes-patients-health-data/

3. Upon information and belief, the accessed files contained a wide variety of highly sensitive personally identifiable information ("PII")[2] and Protected Health Information ("PHI") including one or more of the following: names, addresses, dates of birth, Social Security number, treatment plans, check-up summaries, hospital orders, health insurance information, diagnoses, and doctor names (collectively, "Private Information").[3]

4. Defendant, headquartered in Dallas, TX, is a healthcare technology firm that provides billing services to physicians and works with numerous healthcare organizations in the U.S. including Intrepid, AccentCare, Interim, Prima Care, and many others.[4] The company claims to have helped sign millions of medical documents over the past 15 years.

5. As part of their business, and in order to gain profits, Defendant obtained and stored Plaintiffs' and Class Members' Private Information.

6. By taking possession and control of Plaintiffs' and Class Members' Private Information, Defendant assumed a legal duty to securely store and protect the Private Information of Plaintiffs and the Class.

7. Defendant breached this duty and betrayed the trust of Plaintiffs and Class Members by failing to properly safeguard and protect their Private Information, thus enabling cybercriminals to access, acquire, appropriate, compromise, disclose, encumber, exfiltrate, release, steal, misuse, and/or view it.

---

[2] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[3] Vilius Petkauskas, *Doctors Alliance breach allegedly exposes patients' health data* (Nov. 10, 2025), https://cybernews.com/security/doctor-alliance-breach-allegedly-exposes-patients-health-data/

[4] *Id.*

8. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

9. Defendant's misconduct—failing to implement adequate and reasonable measures to protect Plaintiffs' and Class Members' Private Information, failing to timely detect the Data Breach, failing to take adequate steps to prevent and stop the Data Breach, failing to disclose the material facts that they did not have adequate security practices in place to safeguard the Private Information, and failing to provide timely and adequate notice of the Data Breach—caused substantial harm and injuries to Plaintiffs and Class Members across the United States.

10. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant. Thus, Defendant knew that failing to take reasonable steps to secure the Private Information left them in a dangerous and vulnerable condition. Indeed, Defendant, sophisticated companies bound to specific safeguards for Private Information under federal law, knew the importance of proper data protection and was on notice that its systems were vulnerable.

11. Defendant was negligent and breached their duties and obligations by failing in one or more of the following ways: (a) to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (b) to design, implement, and maintain reasonable data retention policies; (c) to effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; (d) adequately vet and audit vendors responsible for data retention and security; (e) to adequately train

employees regarding data security; (f) to comply with industry-standard data security practices; (g) to timely warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (h) to encrypt or adequately encrypt sensitive information that was stored on Defendant's servers; (i) to timely recognize or detect that its servers had been compromised and accessed in a timely manner to mitigate the harm; (j) to utilize widely available software able to detect and prevent this type of attack; (k) to limit access to Plaintiffs' and Class Members' sensitive data; and (l) to timely notify Plaintiffs and Class Members of the Data Breach. Defendant's conduct amounts to at least negligence and violates federal and state statutes.

12. The sensitive nature of the data maintained by Defendant and potentially compromised in the Data Breach, shows that Plaintiffs and Class Members have suffered irreparable harm. Plaintiffs and Class Members have lost the ability to control their Private Information and are now subject, due to Defendant's negligence and malfeasance, to actual and increased risk of identity theft.

13. As a direct and proximate result of Defendant's inadequate data security and negligence as well as breaches of their duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was accessed by cybercriminals and exposed to an untold number of unauthorized individuals. Plaintiffs and the Class Members have suffered and will continue to suffer concrete injuries including: (a) unreimbursed financial losses caused by misuse of their Private Information; (b) the loss or diminished value of their Private Information as a result of the Data Breach; (c) lost time spent dealing with the actual misuse of the compromised data, including time spent dealing with fraudulent credit card charges, and lost time spent detecting and preventing identity theft; (d) actual identity theft and fraud; (e) financial costs incurred due to actual identity theft; (f) loss of time incurred due to actual identity theft; (g) deprivation of value of

their Private Information; (h) loss of privacy; (i) emotional distress including anxiety and stress in dealing with the Data Breach; and (j) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect it. The risk of identity theft caused by this Data Breach is impending and has materialized, as there is evidence that the Plaintiffs' and Class Members' Private Information was targeted, accessed, misused, and disseminated on the dark web.

14. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes. Mitigating that risk, to the extent even possible, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

15. Plaintiffs bring this action on behalf of themselves and all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; and (iv) timely notify Plaintiffs and Class Members of the Data Breach. Defendant's conduct amounts to at least negligence and violates federal and state statutes.

16. Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen because of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## II. JURISDICTION AND VENUE

17. The Court has jurisdiction over this action under CAFA, 28 U.S.C. § 1332(d)(2), because this is a class action consisting of more than 100 Class Members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the Class is a citizen of a state that differs from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18. The Court has general personal jurisdiction over Defendant because they maintain their headquarters in this District, regularly conduct business in this District, and have sufficient minimum contacts in this District.

19. Venue is likewise proper as to Defendant in this District under 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is in this District, and therefore Defendant reside in this District pursuant to 28 U.S.C. § 1391(c)(2). Venue is further proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

## III. THE PARTIES

***Plaintiffs***

20. Plaintiff Barbara Catabia is a citizen and resident of Dighton, Massachusetts

21. Plaintiff Lisa Colucciello is a citizen and resident of Fall River, Massachusetts.

22. Plaintiff Harold Weathers is a citizen and resident of Olustee, Oklahoma.

23. Plaintiff Martha Hobbs is a citizen and resident of Altus, Oklahoma.

24. Plaintiff Rachel Dias is a citizen and resident of Fall River, Massachusetts.

***Defendant***

25. Defendant My485, Inc. d/b/a Doctor Alliance is a Texas corporation with its

headquarters and principal place of business located at 3131 McKinney Ave, Suite 600, Dallas, TX 75204.[5,6] Defendant's registered agent is Vivek Kushalnagar with a registered address listed as 835 E Lamar #210 Arlington, Texas 76011.

## IV. FACTUAL ALLEGATIONS

### A. Defendant Collected, Maintained, and Shared Plaintiffs' and Class Members' Private Information.

26. Defendant is a healthcare technology platform providing assistance to physicians and medical agencies to manage documents, referrals, and billing through its online system, integrating with services like Axxess Home Health.[7]

27. Upon information and belief, Defendant's Clients include medical agencies such as: Intrepid, Carter, Bayada, AccentCare, Angmar, and Prima Care.[8] Defendant collects, maintains, and manages the records of the patients of the aforementioned health medical agencies.

28. As a condition of doing business, Defendant requires that its Clients—physicians and medical agencies—entrust it with highly sensitive personal and health information belonging to their patients. In the ordinary course of receiving service from Defendant's Clients, Plaintiffs and Class Members were required to provide their Private Information to Defendant.

29. The information held by Defendant at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class members.

---

[5] Plaintiffs have attempted to serve Defendant to no avail at 750 N Saint Paul St. Ste 250 Dallas, TX 75201, which is the address publicly listed online; https://www.chamberofcommerce.com/business-directory/texas/dallas/software-company/2007052674-doctor-alliance (last visited June 26, 2026).

[6] Doctor Alliance LinkedIn page lists 3131 McKinney Ave., Suite 600, Dallas, TX 75204 as the location for its headquarters; https://www.linkedin.com/company/doctor-alliance/about/ (last visited July 2, 2026).

[7] *See* https://dailydarkweb.net/doctor-alliance-hit-by-ransomware-attack-and-data-breach/ (last visited June 26, 2026).

[8] *See* https://doctoralliance.com/ (last visited June 26, 2026).

30. On information and belief, in exchange for receiving Plaintiffs' and Class Members' Private Information, Defendant made promises and representations to individuals' that the Private Information collected from them would be kept safe and confidential, that the privacy of that information would be maintained, that the data would be used only for authorized and legitimate purposes, and that Defendant would delete such information after it was no longer required to maintain it, including through its privacy policies.[9]

31. Plaintiff and Class Members provided their Private Information to Defendant, through their medical providers, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

**B. Defendant Had Duties to Protect Plaintiffs and Class Members' Private Information.**

32. Defendant had and has obligations promulgated by the Federal Trade Commission ("FTC") Act, HIPAA, common law, contract, and industry standards, to keep Plaintiffs' and Class Members' Private Information confidential and protected from unauthorized disclosure.

33. Additionally, by obtaining, using, and benefitting from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known they were responsible for protecting that Private Information from unauthorized access and disclosure.

34. Defendant also owed a duty to protect Plaintiffs and Class Members from the harm that insufficient data security and the consequential exposure of Private Information would cause, because such harm was foreseeable and reasonably preventable.

---

[9] *See* Doctors Alliance Privacy Policy, https://live.doctoralliance.com/all/Pages/PrivacyPolicy (last visited June 26, 2026).

35. Defendant knew it was storing valuable, sensitive Private Information and that as a result, its systems would be an attractive target for cybercriminals who exploit Private Information for its value in committing fraud and identity theft.

36. Defendant also knew that any breach of their network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into their private and sensitive financial matters.

37. Defendant's duty to protect Plaintiffs and Class Members from the foreseeable risk of injury obligated Defendant to implement reasonable practices to keep Plaintiffs' and Class Members' sensitive Private Information confidential and securely maintained, to use and disclose it for necessary and authorized purposes only, to delete the data from network systems or applications when no longer necessary for legitimate business purposes, and to train employees on reasonable cybersecurity red flags and protection techniques.

38. Defendant owed and still owe the foregoing duties to protect Private Information in their custody from unauthorized disclosure, and Defendant had the practical ability to fulfill those duties—yet, they failed to do so, allowing the Data Breach to occur.

**C. The Data Breach**

39. On or around November 10, 2025, unidentified cybercriminals announced the attack against Defendant on a poplar data leak forum, which is often utilized to exchange stolen records.[10] The stolen data includes sensitive personal information and medical data ranging from

---

[10] Vilius Petkauskas, *Doctors Alliance breach allegedly exposes patients' health data* (Nov. 10, 2025), https://cybernews.com/security/doctor-alliance-breach-allegedly-exposes-patients-health-data/

diagnoses to checkup summaries.[11]

40. Upon information and belief, over 1.2 million records containing personal and medical information have been accessed and compromised in the Breach, including Plaintiff and Class Members.[12]

41. According to the attackers' post, the records obtained from Defendant make up 200MB of data that includes various medical records, riddled with sensitive personal data such as: prescriptions, treatment plans, hospital orders, names, health insurance information, home addresses, phone number, diagnoses, doctors names, and Social Security number.[13]

42. The following is the post made by the unidentified cybergroup that obtained patients' files in the Breach:[14]

[11] *Id.*

[12] PR Newswire, *Privacy Alert: Defendant Business Services, LLC Under Investigation for Data Breach of Over 10 Million Records* (Oct. 31, 2025), https://www.morningstar.com/news/pr-newswire/20251031dc12072/privacy-alert-conduent-business-services-llc-under-investigation-for-data-breach-of-over-10-million-records

[13] *Id.*

[14] *See* https://cybernews.com/security/doctor-alliance-breach-allegedly-exposes-patients-health-data/ (last visited June 26, 2026).




43. The unidentified threat actor claims to have breached Doctor Alliance and demands a $200,000 ransom, threatening to sell the data if the demand is not met by November 21, 2025, deadline.[15]

44. According to the actor, the Breach resulted in the exfiltration of a significant amount of data. The allegedly compromised data includes 1,240,640 files with a total size of 353GB of information.[16]

45. On or around April 2, 2026, Defendant posted on its website a notice of the Data Breach stating, "The involved information included patient names and information related to patient care."[17] Defendant also publicly announced that their investigation determined that the unauthorized party accessed Defendant's files between October 31, 2025 and November 17,

[15] *See* https://dailydarkweb.net/doctor-alliance-hit-by-ransomware-attack-and-data-breach/ (last visited June 26, 2026).
[16] *Id.*
[17] Doctor Alliance, https://live.doctoralliance.com/Home/DataIncident (last visited June 26, 2026).

2025.[18]

46. Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[19] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[20]

47. Upon information and belief, Defendant did not pay the ransom, and Plaintiff' and Class Members' Private Information stolen in the Data Breach is now published on the dark web or at risk of being published for any nefarious actor to view, download, and use to commit identity theft and other crimes against Plaintiff and Class Members.

48. Accordingly, Defendant had obligations created by industry standards, common law, statutory law, and their own assurances and representations to keep Plaintiffs and Class Members' Private Information confidential and to protect such Private Information from unauthorized access.

49. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing the exposure and theft of such data.

50. The stolen Private Information at issue has great value to the hackers, due to the large number of individuals affected and the fact the sensitive information that was part of the data that was compromised.

---

[18] *Id.*
[19] *Ransomware: The Data Exfiltration and Double Extortion Trends, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends*

[20] *Id.*

### D. Defendant Was on Notice of Cyber Attack Threats and of the Inadequacy of Its Data Security.

51. Defendant's negligence in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data, particularly financial data.

52. Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the Internet black market known as the dark web.

53. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as his or her name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information connected or linked to an individual such as his or her birthdate, birthplace, and mother's maiden name.

54. Data thieves regularly target entities that store Private Information like Defendant due to the highly sensitive information they maintain. Defendant knew and understood that Plaintiffs' and Class Members' Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

55. In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[21]

56. Data breaches are on the rise since. The increase in data breach attacks, and

[21] High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations, FBI, available at https://www.ic3.gov/Media/Y2019/PSA191002 (last accessed September 4, 2023).

attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industries, including Defendant themselves. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[22]

57. In 2023 there were 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. "In 2024, healthcare data breaches reached an all-time high, with 276,775,457 records compromised – a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States population."[23] The number of data breach victims surpassed 1 billion for the first half of 2024, according to the Identity Theft Resource Center.[24]

58. This trend has not slowed. The United States saw a new record of 3,322 data compromises in 2025, a massive 79 percent (79%) jump over five years.[25]

59. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting entities such as Defendant that stored large volumes of PII, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

---

[22] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond*, https://www.ibm.com/reports/data-breach

[23] Cybernews, *US Hospitals and Health Systems Data Breach* (Apr. 8, 2025), available at https://cybernews.com/security/us-hospitals-and-health-systems-data-breach/

[24] https://www.usatoday.com/story/money/2024/07/18/data-breach-what-to-do/74441060007/.

[25] *2025 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 2026), available at: https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited June 26, 2026).

60. In light of recent high profile data breaches at other healthcare organizations, including Yale New Haven Health (5.5 million records, April 2025), Episource, LLC (5.4 million records, June 2025), Blue Shield of California (4.7 million records, May 2025), Frederick Health Medical Group (934,326 records, February 2025), University of Pittsburgh Medical Center (712,000 records, March 2025), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

61. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

62. As software, data analytics, and advisory service providers to medical providers in possession of patient Private Information, Defendant knew or should have known the importance of safeguarding the Private Information entrusted to them by Plaintiffs and Class Members.

63. Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information in Defendant's custody and care would be targeted by hackers and cybercriminals for use in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

64. Defendant likewise knew or should have known of the foreseeable consequences if its network systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to a breach. Nevertheless, Defendant failed to implement or follow reasonable cybersecurity measures to protect against the Data Breach.

**E. Defendant Was Required, But Failed, to Comply with FTC Rules and Guidance.**

65. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

66. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

67. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

68. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

69. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet

its data security obligations.

70. Such FTC enforcement actions include actions that fail to employ adequate data security practices like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

71. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duties in this regard.

72. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "[m]ost consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[26]

73. Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

74. Defendant's failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

---

[26] *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), *available at* http://ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited June 26, 2026).

**F. Defendant Failed to Comply with HIPAA Guidelines.**

75. Defendant are covered entities under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

76. Defendant are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[27] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

77. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

78. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

79. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

80. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

81. HIPAA's Security Rule requires Defendant to do the following:

---

[27] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforce.

82. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

83. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

84. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable

delay and ***in no case later than 60 days following discovery of the breach***."[28]

85. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

86. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

87. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[29] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[30]

[28] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).
[29] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[30] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

**G. Defendant Failed to Comply with Industry Standards and Its Common Law Duty to Safeguard Plaintiffs' and the Class Members' Private Information.**

88. In addition to its obligations under federal and state laws, Defendant owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

89. Data breaches are preventable.[31] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[32] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[33]

90. Defendant's duty owed to Plaintiffs and Class Members obligated them to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that the servers, networks, and protocols storing Plaintiffs' and Class Members' Private Information adequately protected it.

91. Defendant further owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its custody and control, including adequately supervising employees with access to Private Information.

92. Defendant likewise owed a duty to Plaintiffs and Class Members to implement

---

[31] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

[32] *Id.* at 17.

[33] *Id.* at 28.

processes that would detect a compromise of Private Information in a timely manner.

93. A number of published industry and national best practices are widely used as a go-to resource when developing an institution's cybersecurity standards.

94. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

95. The U.S. Government's National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:[34]

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

---

[34] National Institute of Standards and Technology, *Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

96. Further still, United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including:

a. Reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication,"

b. "Ensur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA,"

c. "Confirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and

d. "Ensur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events",

e. "Confirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and

f. "Ensur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[35]

---

[35] *Shields Up: Guidance for Organizations*, CYBERSECURITY & INFRASTRUCTURE SEC. AG'Y, https://www.cisa.gov/shields-guidance-organizations (last visited June 26, 2026).

97. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of one or more of the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

**H. The Harms Caused by the Data Breach Now and Going Forward**

98. Defendant's failure to ensure adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately caused injuries to Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

99. As a result of the Data Breach, the Private Information of Plaintiffs and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class Members, or likely to be suffered as a direct result of Defendant's Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (e) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (f) damage to and diminution in value of their personal data entrusted

to Defendant with the mutual understanding that Defendant would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (g) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further injurious breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

**i. *The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft.***

100. The ramifications of Defendant's failures to keep secure the Private Information Plaintiffs and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future. Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). When "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[36]

101. Plaintiffs and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[6]

---

[36] *Prevention and Preparedness*, New York State Police, https://troopers.ny.gov/prevention-and-preparedness (last visited June 26, 2026).

102. The types of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[37] This is precisely the kind of PII belonging to Plaintiffs' and the Class that was taken from Defendant's systems.

103. Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. The dark web is an unindexed layer of the Internet that requires special software or authentication to access. Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.

104. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

105. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.[38] A sophisticated black market

[37] 17 C.F.R. § 248.201 (2013).
[38] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited June 26, 2026).

exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PII like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the Internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.

106. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[39] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[40]

107. Private Information remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[41] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[42]

108. Social Security numbers, for example, are among the worst kind of personal

---

[39] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited June 26, 2026).
[40] *Id.*
[41] *Id.*
[42] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015) https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 26, 2026).

information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[43]

109. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[44] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[45] In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[46]

110. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of

---

[43] Social Security Admin., Pub. No. 06-10064, *Identity Theft and Your Social Security Number* (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[44] *See* Social Security Admin., *Avoid Identity Theft: Protect Social Security Numbers*, https://www.ssa.gov/phila/ProtectingSSNs.htm (last visited June 26, 2026).
[45] *Id.*
[46] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft (last visited June 26, 2026).

misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.[47] Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[48]

111. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."); *see also McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 272 (S.D.N.Y. Mar. 8, 2021) (noting that Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves"; unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] Social Security number derives its value in that it is immutable," and when stolen can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks").

112. Victims of identity theft suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other

[47] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 26, 2026).
[48] *Id.*

> monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[49]

113. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

114. Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[50]

115. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[51]

116. Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data

---

[49] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

[50] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ .

[51] *Id.*

centers."[52]

117. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

118. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[53]

119. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

120. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

121. One such example of criminals piecing together bits and pieces of compromised

[52] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Apr. 4, 2019, https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

[53] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020) https://www.fbi.gov/news/stories/2019-Internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion (last visited June 26, 2026).

Private Information for profit is the development of "Fullz" packages.[54]

122. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

123. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

124. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

---

[54] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Maria Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

125. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

126. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals.

127. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized actors can easily access and misuse Plaintiffs' and Class Members' Private Information due to the Data Breach.

128. Plaintiffs and Class Members are also at a continued risk because their Private Information remains on Defendant's server, which has already been shown to be susceptible to compromise and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security measures to protect consumers' Private Information in its care.

**ii. *Loss of Time to Mitigate the Risk of Identify Theft and Fraud***

129. In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[55]

130. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm. Plaintiffs and Class Members have spent time, and will spend additional time in the future, on a variety of

[55] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited June 26, 2026) ("GAO Report").

prudent actions, such as placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

131. Plaintiffs' and Class Members' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[56]

**iii. *Diminished Value of PII***

132. PII is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value. Indeed, on the black market, PII can sell for as much as $363 per record according to the Infosec Institute.[57]

133. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[58] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data

---

[56] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf. (last visited June 26, 2026).

[57] *Data Breaches: In the Healthcare Sector*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited June 26, 2026).

[58] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LA TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited June 26, 2026).

broker who in turn aggregates the information and provides it to marketers or app developers.[59] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[60]

134. The fraudulent activity resulting from the Data Breach may not come to light for years.

135. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

#### iv. ***Reasonable and Necessary Future Cost of Credit and Identity Theft Monitoring***

136. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

137. Such fraud may go undetected until debt collection calls commence months or even years later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected

---

[59] DATACOUP, https://datacoup.com/ (last visited June 26, 2026).

[60] *Frequently Asked Questions*, NIELSEN, available at: https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

138. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers). Consequently, Plaintiffs and Class Members are at a substantially increased risk of fraud and identity theft for many years into the future, if not for the remainder of their lifetimes, necessitating Plaintiffs to undertake credit monitoring and identity theft monitoring to mitigate such risks.

139. To date, Defendant have done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

140. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### v. *Loss of Benefit of the Bargain*

141. Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

142. When agreeing to provide their Private Information, which was a condition precedent to obtain services from Defendant, and paying Defendant, directly or indirectly, for

these products and services, Plaintiffs and Class Members as consumers understood and expected that they were, in part, paying a premium for services and data security to protect the Private Information they were required to provide.

143. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than they reasonably expected to receive under the bargains struck with Defendant and its Clients.

***vi. Emotional Distress***

144. In addition to a remedy for economic harm, Plaintiffs and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

145. The actual and adverse effects to Plaintiffs and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly or proximately caused by Defendant's wrongful actions and/or inaction and the resulting Data Breach require Plaintiffs and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or Internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiffs and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

**I. Plaintiffs' Experiences & Injuries**

***Plaintiff Barbara Catabia***

146. Plaintiff Barbara Catabia is a patient of Prima Care.

147. Upon information and belief, Defendant received, stored, and managed the

sensitive personal and medical health information of Plaintiff as a healthcare technology firm that provides billing services to physicians and medical agencies.

148. Plaintiff Catabia entrusted her Private Information to Defendant as the record custodian of her Private Information through Prima Care with the reasonable expectation and mutual understanding that Defendant would keep her Private Information secure from unauthorized access.

149. By soliciting and accepting Plaintiff Catabia's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

150. Upon information and belief, Defendant was in possession of Plaintiff Catabia's Private Information before, during, and after the Data Breach.

151. Plaintiff Catabia reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Catabia would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

152. Plaintiff Catabia greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

153. Plaintiff Catabia stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contains any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

154. Moreover, Plaintiff Catabia diligently chooses unique usernames and passwords for her various online accounts.

155. As a result of the Data Breach, Plaintiff Catabia has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

156. As a consequence of and following the Data Breach, Plaintiff Catabia has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of her Private Information.

157. The Data Breach has caused Plaintiff Catabia to suffer fear, anxiety, and stress.

158. Plaintiff Catabia anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for the remainder of her lifetime.

159. Plaintiff Catabia has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

160. As a direct and traceable result of the Data Breach, Plaintiff Catabia suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now

possess her sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff and (g) other economic and non-economic harm.

***Plaintiff Lisa Colucciello***

161. Plaintiff Lisa Colucciello is a patient of Prima Care.

162. As a condition of receiving medical services, Plaintiff Colucciello was required to supply Defendant with her Private Information—including her name, date of birth, Social Security number, driver's license or state identification number, medical history, address, phone number, and email address.

163. By soliciting and accepting Plaintiff Colucciello's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

164. Upon information and belief, Defendant was in possession of Plaintiff Colucciello's Private Information before, during and after the Data Breach.

165. Plaintiff Colucciello would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

166. To the best of Plaintiff Colucciello's knowledge, her Private Information has not been compromised in a prior data breach.

167. Following the Data Breach, upon information and belief, Plaintiff Colucciello made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. This is valuable time that Plaintiff spent that she otherwise would

have spent on other activities, including but not limited to work and/or recreation.

168. Plaintiff Colucciello will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

169. Plaintiff Colucciello places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Colucciello entrusted Defendant with her Private Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Private Information would not be compromised.

170. As a consequence of and following the Data Breach, Plaintiff Colucciello has experienced a significant uptick in spam calls, texts messages, and emails. Plaintiff Colucciello attributes the increase of unsolicited spam communications to the Data Breach based on temporal proximity, her careful handling of her Private Information, and the fact that these spam communications are atypical in Plaintiff Colucciello's experience.

171. Because of the Data Breach, there is no doubt Plaintiff Colucciello's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Colucciello and the Class are at an imminent risk of identity theft and fraud.

172. Due to Defendant's Breach, Plaintiff Colucciello will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's negligent conduct and breach of duty to maintain Plaintiff Colucciello's highly sensitive Private Information secure and protected against unauthorized

disclosure.

173. Plaintiff Colucciello's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

174. Knowing that thieves intentionally targeted and accessed her Private Information, has caused Plaintiff Colucciello great anxiety beyond mere worry.

175. Plaintiff Colucciello has never knowingly transmitted unencrypted Private Information over the Internet or any other unsecured source.

176. As a direct and traceable result of the Data Breach, Plaintiff Colucciello suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Colucciello and/or her medical providers; and (vii) other economic and non-economic harm.

177. Plaintiff Colucciello has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for the remainder of her lifetime. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

178. Plaintiff Colucciello has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Colucciello's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Harold Weathers***

179. Plaintiff Harold Weathers is a patient of Jackson Memorial Hospital in Altus, Oklahoma.

180. Upon information and belief, Jackson Memorial Hospital is a Client of Defendant and provided Plaintiff's Private Information to Defendant, which Defendant stored, maintained, and managed in its network and computer systems.

181. As a condition of receiving medical services, Plaintiff Weathers was required to supply Defendant with his Private Information through his medical provider—including his name, date of birth, Social Security number, driver's license or state identification number, medical history, address, phone number, and email address.

182. Upon information and belief, Defendant was in possession of Plaintiff Weathers's Private Information before, during and after the Data Breach.

183. By soliciting and accepting Plaintiff Weathers's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

184. Plaintiff Weathers would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

185. Plaintiff Weathers greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Weathers is

very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

186. Plaintiff Weathers stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

187. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

188. As a result of the Data Breach, Plaintiff Weathers has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff Weathers would have spent on other activities, including but not limited to work and/or recreation.

189. As a consequence of and following the Data Breach, Plaintiff Weathers has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of his Private Information. Plaintiff Weathers attributes these spam communications to the Data Breach based on temporal proximity, his careful handling of his Private Information, and the fact that these spam communications are atypical in Plaintiff Weathers's experience.

190. The Data Breach has caused Plaintiff Weathers to suffer fear, anxiety, sleep disruption, and stress which has been compounded by Defendant delay in noticing his of the fact Private Information was acquired by criminals as a result of the Data Breach.

191. Plaintiff Weathers anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

192. Plaintiff Weathers will continue to be at present and continued increased risk of

identity theft and fraud for the remainder of his lifetime. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

193. Plaintiff Weathers has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

194. As a direct and traceable result of the Data Breach, Plaintiff Weathers suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess his sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Weathers and (g) other economic and non-economic harm.

***Plaintiff Martha Hobbs***

195. Plaintiff Martha Hobbs is a patient of Jackson Memorial Hospital in Altus, Oklahoma.

196. Upon information and belief, Jackson Memorial Hospital is a Client of Defendant and provided Plaintiff Hobbs' Private Information to Defendant, which Defendant stored, maintained, and managed in its network and computer systems.

197. As a condition of receiving medical services, Plaintiff Hobbs was required to supply Defendant with her Private Information through her medical provider—including her name, date of birth, Social Security number, driver's license or state identification number, medical history, address, phone number, and email address.

198. Upon information and belief, Defendant was in possession of Plaintiff Hobbs' Private Information before, during and after the Data Breach.

199. By soliciting and accepting Plaintiff Hobbs's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

200. Plaintiff Hobbs would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

201. Plaintiff Hobbs greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Hobbs is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

202. Plaintiff Hobbs stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

203. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

204. As a result of the Data Breach, Plaintiff Hobbs has spent several hours researching

the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords and other necessary mitigation efforts. This is valuable time that Plaintiff Hobbs would have spent on other activities, including but not limited to work and/or recreation.

205. As a consequence of and following the Data Breach, Plaintiff Hobbs has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of her Private Information. Plaintiff Hobbs attributes these spam communications to the Data Breach based on temporal proximity, her careful handling of her Private Information, and the fact that these spam communications are atypical in Plaintiff Bobbs's experience.

206. The Data Breach has caused Plaintiff Hobbs to suffer fear, anxiety, sleep disruption, and stress which has been compounded by Defendant delay in noticing her of the fact Private Information was acquired by criminals as a result of the Data Breach.

207. Plaintiff Hobbs anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

208. Plaintiff Hobbs will continue to be at present and continued increased risk of identity theft and fraud for the remainder of her lifetime. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

209. Plaintiff Hobbs has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

210. As a direct and traceable result of the Data Breach, Plaintiff Hobbs suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit

reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Hobbs and (g) other economic and non-economic harm.

***Plaintiff Rachel Dias***

211. Plaintiff Rachel Dias is a patient of Defendant Prima care.

212. As a condition of receiving medical services, Plaintiff Dias was required to supply Defendant with her Private Information—including her name, date of birth, Social Security number, driver's license or state identification number, medical history, address, phone number, and email address.

213. By soliciting and accepting Plaintiff Dias' Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

214. Upon information and belief, Defendant was in possession of Plaintiff Dias' Private Information before, during and after the Data Breach.

215. Plaintiff Dias would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

216. To the best of Plaintiff Dias' knowledge, her Private Information has not been

compromised in a prior data breach.

217. Following the Data Breach, upon information and belief, Plaintiff Dias made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. This is valuable time that Plaintiff spent that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

218. Plaintiff Dias will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

219. Plaintiff Dias places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Dias entrusted Defendant with her Private Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Private Information would not be compromised.

220. Because of the Data Breach, there is no doubt Plaintiff Dias' highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Dias and the Class are at an imminent risk of identity theft and fraud.

221. Due to Defendant's Breach, Plaintiff Dias will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's negligent conduct and breach of duty to maintain Plaintiff's highly

sensitive Private Information secure and protected against unauthorized disclosure.

222. Plaintiff Dias' highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

223. Knowing that thieves intentionally targeted and accessed her Private Information, has caused Plaintiff Dias great anxiety beyond mere worry.

224. Plaintiff Dias has never knowingly transmitted unencrypted Private Information over the Internet or any other unsecured source.

225. As a direct and traceable result of the Data Breach, Plaintiff Dias suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Dias and/or her medical providers; and (vii) other economic and non-economic harm.

226. Plaintiff Dias has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for the remainder of her lifetime. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

227. Plaintiff Dias has a continuing interest in ensuring that her Private Information,

which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Dias' Private Information will be wholly unprotected and at-risk of future data breaches.

## V. CLASS ACTION ALLEGATIONS

228. Plaintiffs bring this suit on behalf of themselves and the class of similarly situated individuals under Rule 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rule of Civil Procedure. Plaintiffs assert all claims on behalf of the Classes, defined as follows:

> All individuals whose Private Information was accessed and/or acquired by an unauthorized party in Defendant's Data Breach.

229. Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

230. Plaintiffs reserve the right to amend the Class definitions above or add a subclass if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way in subsequent pleadings and motions for class certification.

231. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

232. **Ascertainability:** All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

233. **Numerosity:** The Class Members are so numerous that joinder of all members is

impracticable. Upon information and belief, while the exact number is unknown to Plaintiffs, approximately 1.2 million individuals have been affected by this breach. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, self-identification, and other means.

234. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members'. Plaintiffs and all Class Members were injured through Defendant's uniform misconduct. The same event and conduct that gave rise to Plaintiffs' claims are identical to those that give rise to the claims of every other Class Member because Plaintiffs and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct as Defendant.

235. **Adequacy:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class and proposed Subclass that they seek to represent; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs' and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

236. **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for Class Members individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and

provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

237. **Commonality and Predominance:** Defendant engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' Private Information was stored on the same network and unlawfully accessed in the same way. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant engaged in the wrongful conduct alleged herein;

b. Whether Defendant failed to adequately safeguard Plaintiffs' and Class Members' Private Information;

c. Whether Defendant's email, computer systems, and data security practices used to protect Plaintiffs' and Class Members' Private Information violated the FTC Act, HIPAA CMIA and/or state laws and/or Defendant's other duties discussed herein;

d. Whether Defendant owed a duty to Plaintiffs and Class Members to adequately protect their Private Information, and whether they breached this duty;

e. Whether Defendant knew or should have known that its computer and network security systems and business email accounts were vulnerable to a data breach;

f. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach;

g. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and Class Members;

h. Whether Defendant continue to breach duties to Plaintiffs and Class Members;

i. Whether Plaintiffs and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

j. Whether Plaintiffs and Class Members are entitled to recover damages, equitable relief, and other relief;

k. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and Class Members and the general public;

l. Whether Defendant's actions alleged herein constitute gross negligence; and

m. Whether Plaintiffs and Class Members are entitled to punitive damages.

## VI. CAUSES OF ACTION

**COUNT ONE**
**NEGLIGENCE**
**<u>(On Behalf of Plaintiffs and the Class Against Defendant)</u>**

238. Plaintiffs incorporate and reallege paragraphs 1 through 237 as if fully set forth herein.

239. Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information for pecuniary gain, and had a duty to exercise reasonable

care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

240. Upon accepting and storing Plaintiffs' and Class Members' Private Information on its computer systems and networks, Defendant undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information from unauthorized access and disclosure.

241. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Private Information.

242. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

243. Defendant had full knowledge of the sensitivity of the Private Information in its possession and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully accessed or disclosed. Plaintiffs and Class Members were therefore the foreseeable victims of any inadequate data security practices.

244. Defendant's duty to implement and maintain reasonable data security practices arose as a result of the special relationship that exists between Defendant and consumers, which is recognized by laws and regulations, including, but not limited to, HIPAA, the FTC Act, and common law.

245. Defendant was in a superior position to ensure its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a

data breach.

246. Defendant knew Plaintiffs and Class Members relied on it to protect their Private Information. Plaintiffs and Class Members were not in a position to assess the data security practices used by Defendant. Because they had no means to identify Defendant's security deficiencies, Plaintiffs and Class Members had no opportunity to safeguard their Private Information from cybercriminals. Defendant exercised control over the Private Information stored on its systems and networks; accordingly, Defendant was best positioned and most capable of preventing the harms caused by the Data Breach.

247. Defendant was aware, or should have been aware, of the fact that cybercriminals routinely target healthcare entities through cyberattacks in an attempt to steal valuable Private Information. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

248. Defendant owed Plaintiffs and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiffs and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

249. Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

250. Defendant had a duty to protect and safeguard the Private Information of Plaintiffs and the Class from unauthorized access and disclosure. Additionally, Defendant owed Plaintiffs and the Class a duty:

a. to exercise reasonable care in designing, implementing, maintaining, monitoring, and testing its networks, systems, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

b. to protect Plaintiffs' and Class Members' Private Information by using reasonable and adequate data security practices and procedures;

c. to implement processes to quickly detect a data breach, security incident, or intrusion involving its networks and servers; and

d. to promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

251. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information.

252. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiffs' and Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to ensure its email systems had plans in place to maintain reasonable

data security safeguards;

d. Failing to implement and maintain adequate mitigation policies and procedures;

e. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

f. Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and

g. Failing to timely notify Plaintiffs and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

253. Defendant's willful failure to abide by its duties to Plaintiffs and Class Members was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats.

254. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members.

255. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

256. As a direct and proximate result of Defendant's negligent conduct, including, but not limited to, its failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

257. Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to

adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within Defendant's possession and control.

258. Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps to secure their Private Information and mitigate the impact of the Data Breach.

259. Plaintiffs and Class Members could have taken actions earlier had they been timely notified of the Data Breach.

260. Plaintiffs and Class Members could have enrolled in credit monitoring, instituted credit freezes, and changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

261. Plaintiffs and Class Members suffered harm from Defendant's delay in notifying them of the Data Breach.

262. As a direct and proximate result of Defendant's conduct, including, but not limited to, Defendant's failure to implement and maintain reasonable data security practices and procedures, Plaintiffs and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to

prevent, detect, contest and recover from fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant failed to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

263. The damages Plaintiffs and the Class have suffered and will suffer (as alleged above) were and are the direct and proximate result of Defendant's negligent conduct.

264. Plaintiffs and the Class have suffered cognizable injuries and are entitled to actual and punitive damages in an amount to be proven at trial.

**COUNT TWO**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class Against Defendant)**

265. Plaintiffs incorporate and reallege paragraphs 1 through 237 as if fully set forth herein.

266. Plaintiffs allege this claim in the alternative to their breach of implied contract claim.

267. Plaintiffs and Class Members conferred a monetary benefit on Defendant, by providing Defendant with their valuable Private Information. In so conferring this benefit, Plaintiffs and Class Members understood that part of the benefit Defendant derived from the Private Information would be applied to data security efforts to safeguard the Private Information.

268. Defendant required Plaintiff's and Class Members' Private Information to conduct

its business and generate revenue, which it could not do without collecting and maintaining Plaintiff's and Class Members' Private Information.

269. Defendant enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff' and Class Members' Private Information.

270. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant chose to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

271. Defendant failed to implement—or adequately implement—data security practices, procedures, and programs to secure sensitive Private Information, including without limitation those industry standard data security practices, procedures, and programs discussed herein.

272. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

273. Defendant acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

274. If Plaintiffs and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

275. Plaintiffs and Class Members have no adequate remedy at law.

276. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class

Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

277. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

278. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

**COUNT THREE**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and the Class Against Defendant)**

279. Plaintiffs incorporate and reallege paragraphs 1 through 237 above as if fully set forth herein.

280. Defendant entered into contracts, written or implied, with its Clients to perform

services. Upon information and belief, these contracts are virtually identical between and among Defendant and its Clients around the country whose patients, including

281. In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class against unauthorized disclosure.

282. These contracts were made expressly for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its Clients. Defendant knew that if it were to breach these contracts with its Clients, its Clients' patients—Plaintiffs and Class Members—would be harmed.

283. Defendant breached the contracts it entered into with its Clients by, among other things, failing to (i) use adequate and reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and timely notifying Plaintiffs and Class Members thereof.

284. Plaintiffs and the Class were harmed by Defendant breach of its contracts with its Clients (as alleged above), as such Breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

285. Plaintiffs and Class Members are also entitled to their costs and attorney's fees incurred in this action.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request the following relief:

A. An Order certifying this action as a Class Action under Federal Rule of Civil Procedure 23, defining the Class as requested herein and appointing Plaintiffs as Class

representatives and the undersigned as Class counsel;

B. For a judgment in favor of Plaintiffs and the Class, awarding them appropriate monetary relief, including compensatory damages, punitive damages, nominal damages, attorneys' fees, expenses, costs, and such other and further relief as is just and proper;

C. For an order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

D. For an order requiring Defendant to pay the costs involved in notifying the Class about the judgment and administering the claims process;

E. For a judgment in favor of Plaintiffs and the Class, awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

F. For an award of such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: July 2, 2026 Respectfully submitted,

By: */s/ William B. Federman*
William B. Federman
TX Bar No. 00794935
Jessica A. Wilkes
**FEDERMAN & SHERWOOD**
4131 N. Central Expressway Suite 900
Dallas, TX 75204
Telephone: (800) 237-1277
Facsimile: (405) 239-2112
E: wbf@federmanlaw.com
E: jaw@federmanlaw.com

Jeff Ostrow
**KOPELOWITZ OSTROW P.A.**
One West Law Olas Blvd., Suite 500

Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
ostrow@kolawyers.com

John J. Nelson
**MILBERG, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

*Interim Co-lead Class Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

The undersigned attorney of record hereby certifies that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: July 2, 2026

*/s/ William B. Federman*
William B. Federman